### UNITED STATES of America

### v.

**Zayd Hassan Abd Al–Latif Masud Al SAFARINI, also known as Mustafa Hassan Said Bomer, also known as Mustafa, Defendant.**

### No. CR. 91–504–03(EGS).

United States District Court, District of Columbia.

April 10, 2003.

---

7. An Order consistent with the Court's ruling accompanies this Memorandum Opinion.

Robert L. Tucker, Assistant Federal Public Defender, Federal Public Defender's Office, Washington, DC.

David I. Bruck, Columbia, SC.

Timothy J. Simeone, Harris, Wiltshire & Grannis, Washington, DC.

Gregg A. Maisel, Assistant United States Attorney, Transnational/Major Crimes Section, Washington, DC.

Jennifer E. Levy, U.S. Department of Justice, Criminal Division, Terrorism and Violent Crime Section, Washington, DC.

## MEMORANDUM OPINION AND ORDER

SULLIVAN, District Judge.

### Introduction

Pending before the Court is defendant's Motion for Order Barring the Government from Seeking the Death Penalty. The issue presented to the Court is whether the government may seek Mr. Safarini's execution pursuant to a judicially-fashioned amalgam of the Anti–Hijacking Act of 1974 ("Title 49" or "air piracy statute"), which in 1986 was codified at 49 U.S.C. §§ 1472 and 1473, and the Federal Death Penalty Act of 1994 ("FDPA"), 18 U.S.C. §§ 3591 *et seq.*

The defendant argues that the FDPA does not apply to homicides committed before its effective date and that retroactively applying the statute to him in connection with a crime he allegedly committed in 1986 would violate the *Ex Post Facto* Clause, art. I, § 9, cl. 3, of the United States Constitution. The government concedes that, as written, the FDPA would run afoul of *Ex Post Facto* principles if applied to defendant. Nevertheless, it counters that, because the provisions of the FDPA, viewed *in toto,* are ameliorative, and because the FDPA can be rendered *entirely* ameliorative by means of certain judicially-fashioned adjustments, application of the Act is constitutionally permissible.

The Court has considered the parties' motions, oppositions, replies and oral arguments, as well as the statutory and case law governing the issues. For the following reasons, the Court concludes that defendant's Motion for Order Barring the Government from Seeking the Death Penalty is **GRANTED.**

### Background

*Summary of Government Allegations*

This prosecution arises from the hijacking of Pan Am flight 73 in Karachi, Pakistan, on September 5, 1986, by four gunmen allegedly led by Mr. Safarini. The plane was hijacked while it was still on the tarmac boarding passengers. There were approximately 379 passengers and crew members aboard the plane, including an estimated 78 U.S. citizens. The pilot, copilot and engineer escaped while the hijackers were taking control of the aircraft, thereby grounding the plane. While dictating the movements of the passengers and crew, defendant allegedly instructed flight attendants to procure the passports of those aboard the plane in an effort to identify American citizens. The defendant allegedly demanded that the plane be flown to Larnaca, Cyprus and, to emphasize the seriousness of his request, held Mr. Rajesh Kumar, an American citizen, at gunpoint. Mr. Kumar was shot in the head, and his body thrown out of the plane and onto the tarmac.

Following Mr. Kumar's murder, radio communications were established between the plane and the control tower. The defendant allegedly began negotiations on behalf of the hijackers with Pakistani authorities.

When the auxiliary power unit supplying power to the plane failed, the hijackers herded the passengers and crew members into the center of the aircraft, causing some passengers to land on top of others. Allegedly at Mr. Safarini's signal, the hijackers opened fire on the passengers by tossing hand grenades into the crowd and spraying it with automatic weapons fire. Nineteen passengers were killed during the course of the assault, including a second American citizen, Surendra Patel. More than one hundred other passengers were injured.

The defendant was shot in the crossfire during the final assault and, as a conse-

quence, taken to a hospital. He was later found wearing a belt laden with explosives.

### Procedural History

Mr. Safarini was tried jointly with his four co-defendants in Pakistan in 1987 for charges arising from the detailed events. Each defendant was convicted and sentenced to death, though each sentence was subsequently commuted to a life sentence. On August 29, 1991, a one-hundred and twenty-six count indictment against Mr. Safarini was returned under seal by a grand jury in the United States District Court for the District of Columbia. The defendant was released from Pakistani custody on September 27, 2001 and captured by the FBI *en route* to Jordan.

The defendant has remained in custody in the District of Columbia since October 2001. On August 28, 2002, a grand jury in the U.S. District Court for the District of Columbia returned a superceding indictment charging Mr. Safarini and his four co-defendants with ninety-five federal offenses. The indictment identified five potential capital counts alleging violations of Title 18 (Counts Five, Six and Seven) and Title 49 (Count Eight).

On September 18, 2002, defendant filed the pending Motion for Order Barring the Government from Seeking the Death Penalty on *Ex Post Facto* Grounds. On December 12, 2002, the government filed both a Notice of Intent to Seek the Death Penalty relating solely to Count Eight of the superceding indictment and a response to defendant's motion. A hearing on the pending motion was held on February 12, 2003.

### Statutory Framework

*The Anti–Hijacking Act*

At the time of the crime charged, 49 U.S.C. § 1472, defining the offense of "air piracy," required that the offender be punished "by death if the verdict of the *jury shall so recommend.*" (emphasis added.) The sentencing procedures for imposing the death penalty under § 1472, codified at § 1473(c), provided that "the court shall sentence the defendant to death" if the prosecution established one or more statutory aggravating factors and if the defendant failed to establish one of a list of five possible mitigating factors. Def.'s Mot. at 25. The role of the jury pursuant to Title 49's sentencing scheme was limited to determining, by a preponderance of the evidence, whether the specified aggravating and mitigating factors existed. If the jury found a statutory aggravating factor, death followed automatically. *See* 49 U.S.C., App. § 1473(c)(7)(1982). If a statutory mitigating factor was also found, a sentence other than death was required. *See* 49 U.S.C., App. § 1473(c)(6)(1982). No aggravating or mitigating factors outside of § 1473 could be considered in the formulation of a sentencing decision *Id.*

The following statutory aggravating factors were enumerated in Title 49 [1]:

(1) "the death of another person resulted from the commission of the offense but after the defendant had seized or exercised control of the aircraft."

(2) "the defendant has been convicted of another Federal or State offense (committed either before or at the time of the commission or attempted commission of the offense) for which

---

**1.** For the first five factors, the statute required that "the death of another person resulted from the commission of the offense;" for the latter four of these factors, the statute re-

quired that "the death of another person resulted from the commission or attempted commission of the offense." 49 U.S.C., App. § 1473(c)(7)(1982).

a sentence of life imprisonment or death was imposable;"

(3) "the defendant has previously been convicted of two or more State or Federal offenses with a penalty of more than one year imprisonment (committed on different occasions before the time of the commission or attempted commission of the offense) involving the infliction of serious bodily injury upon another person;"

(4) "in the commission or the attempted commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense or attempted offense;" and

(5) "the defendant committed or attempted to commit the offense in an especially heinous, cruel, or depraved manner."

49 U.S.C., App. § 1473(c)(7)(1982).

Section 1473(c) limited the sentencing jury's exercise of discretion to consideration of five potential mitigating factors:

(1) [Whether the defendant] was under the age of eighteen;

(2) [whether] his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution;

(3) [whether] he was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution;

(4) [whether] he was a principal ... in the offense, which was committed by another, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution; or

(5) [whether] he could not reasonably have foreseen that his conduct in the course of the commission of the offense for which he was convicted would cause, or would create a grave risk of causing death to another person.

49 U.S.C. § 1473(c)(6)(1991). As noted above, § 1473(c)(5) provided that

[i]f the jury ... finds by a preponderance of the information that one or more of the [aggravating factors] exists and that none of the [enumerated mitigating factors] exists, the Court shall sentence the defendant to death.

49 U.S.C. § 1473(c)(5).

With respect to the sentencing procedures, § 1473(c)(1) of the Anti–Hijacking Act provides that "a person shall be subjected to the penalty of death for any offense prohibited by section 1472(i) or 1472(n) of this act only if a hearing is held in accordance with this subsection."

*The Federal Death Penalty Act*

In 1994, Congress enacted the Federal Death Penalty Act which, *inter alia,* establishes capital sentencing procedures applicable to all offenses, including violations of Title 49, for which a sentence of death was available. *See* 18 U.S.C. §§ 3591–3598. In addition to creating sentencing procedures, the FDPA created numerous new substantive death-eligible offenses.[2] Of ut-

---

**2.** The FDPA was enacted as Title VI of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. 103–322, 108 Stat. 1796 (Sept. 13, 1994). Section 60002 of the Act contained the sentencing procedures now codified as 18 U.S.C. §§ 3591–98, while sections 60003 and 60005–24 designated numerous of-

fenses, including newly-created ones, for which the death penalty would be available. the wholly new offenses created by the sections mentioned include 18 U.S.C. §§ 36 (drive-by shootings), 37 (violence at international airports), 924(j) (gun murders during Federal crimes of violence and drug traffick-

most significance was the fact that the FDPA expressly repealed the death penalty provision of the air piracy act, 49 U.S.C. § 1472, pursuant to which the government now seeks the death penalty. *See* Pub.L. 103–322, Title VI, § 60003(b), Sept. 13, 1994, 108 Stat.1959.

## Discussion

■ Defendant's motion is styled as a motion to bar the government from seeking the death penalty on *Ex Post Facto* grounds. Accordingly, defendant's motion and the government's opposition focus almost exclusively on questions of notice, the validity of Title 49's sentencing provisions, and other constitutional considerations. It is a fundamental principle of constitutional interpretation that a court should not pass on constitutional questions that are not necessary to determine the case or controversy before it, *see, e.g. Burton v. United States,* 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482 (1905). Accordingly, this Court will focus its analysis of the pending motion on the statutory grounds raised in the pleadings and addressed during the course of oral argument.[3]

As defendant concedes, his argument involves, first and foremost, a question of statutory construction. Before reaching the *Ex Post Facto* issue, the Court must determine whether the FDPA can be applied retroactively to punish crimes committed before its effective date. While the government focuses on whether Congress *could* enact death sentencing procedures applicable to crimes already committed without violating the constitution, defendant correctly notes that the appropriate initial inquiry is whether Congress intend-

ed the FDPA itself to apply on a retroactive basis. *See generally, Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

■ Whether Congress intends a statute to be applied retroactively is a matter of statutory construction. A statute "may not be applied retroactively ... absent a clear indication from Congress that it intended such a result." *INS v. St. Cyr,* 533 U.S. 289, 316, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). In the present case, "the available evidence compels the conclusion that Congress did not intend the Act to apply to offenses that had already been committed before it became law." Def.'s Reply at 14.

■ As *Landgraf* makes abundantly clear, there is a strong presumption against retroactivity. *See Landgraf,* 511 U.S. at 265, 114 S.Ct. 1483 ("the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic"). While retroactive provisions "often serve entirely benign and legitimate purposes," a "requirement that Congress first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption and unfairness." *Id.* at 268, 114 S.Ct. 1483. The interest in avoiding the adjudication of constitutional questions, moreover, may counsel against retroactive application. *Id.* n. 21.

Though retroactivity is disfavored in principle, defining it is not always a

---

ing crimes), 1121 (killing persons aiding Federal investigations or State correctional officers), and 2332a (use of weapons of mass destruction).

**3.** Defendant's motion to bar the government from seeking the death penalty was filed prior

to the government's notice of intent to seek the death penalty. Due to the absence of prior notice regarding the government's intent, defendant addressed the statutory construction issues raised during oral arguments primarily in his reply brief.

straightforward matter. In *Society for Propagation of the Gospel v. Wheeler*, 22 F.Cas. 756 (No. 13,156) (CCDNH 1814), Justice Story provided valuable insight on the question of retroactivity. In the words of the Justice, the ban on retrospective legislation embraced all statutes, which, though operating only from their passage, affect "vested rights and past transactions." *Wheeler*, 22 F. Cas at 767 (quoted in *Landgraf*, 511 U.S. at 268–69, 114 S.Ct. 1483). According to Story,

> Upon principle, every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective ...

*Id.* (quoted in *Landgraf*, 511 U.S. at 269, 114 S.Ct. 1483).

As Justice Story's analysis underscores, a statute does not operate retroactively merely because it is applied in a case arising from conduct preceding the statute's enactment. *See Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 100, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992). The key question for a court seeking to assess retrospectivity is whether the legislation in question attaches *new legal consequences* to acts committed prior to the statute's effective date. Considerations such as fair notice, reasonable reliance and settled expectations offer sound guidance. *See Danforth v. Groton Water Co.*, 178 Mass. 472, 476, 59 N.E. 1033, 1034 (1901) (Holmes, J.).

Despite the strong presumption against retroactivity in the absence of clear Congressional intent, in certain circumstances a statute can properly apply to acts committed prior to its effective date. *See, e.g., Landgraf*, 511 U.S. at 273, 114 S.Ct. 1483 (holding that "[e]ven absent specific legislative authorization, application of new

statutes passed after the events in suit is unquestioningly proper in many situations"). When the intervening statute affects the propriety of prospective relief, for instance, retroactive application of the new provision is proper. *Landgraf*, 511 U.S. at 273, 114 S.Ct. 1483 (citing *American Steel Foundries v. Tri–City Central Trades Council*, 257 U.S. 184, 201, 42 S.Ct. 72, 66 L.Ed. 189 (1921) (holding that § 20 of the Clayton Act of October 15, 1914, Chapter 323, 38 Stat. 738 (Comp.St. § 1243(d)), enacted while the case was pending on appeal, governed the propriety of injunctive relief against labor picketing and noting that "relief by injunction operates *in futuro*," and that plaintiff had no "vested right" in the decree entered by the trial court.))

Similarly, courts have frequently applied intervening statutes concerning issues of jurisdiction. *Id.* (citing *Bruner v. United States*, 343 U.S. 112, 116–117, 72 S.Ct. 581, 96 L.Ed. 786 (1952) (dismissing an action because the jurisdictional statute under which it had been (properly) filed was subsequently repealed.))

Finally, and of particular relevance to the instant case, statutes characterized as procedural have been applied more liberally to past acts than have substantive statutes. The *Landgraf* decision, the principal authority cited by both the government and defendant, held that "[c]hanges in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity." *Landgraf*, 511 U.S. at 275, 114 S.Ct. 1483. Citing the diminished reliance interests in matters of procedure, the *Landgraf* Court shed light on the interface between procedural retrospectivity and the *Ex Post Facto* clause. "While we have strictly construed the *Ex Post Facto* Clause to prohibit application of new statutes creating or increasing punishments

after the fact," stated the Court, "we have upheld intervening procedural changes even if application of the new rule operated to a defendant's disadvantage ..." *Id.* at n. 28. While *Landgraf* involved a civil statute, as evidenced by the Court's reliance on the case of *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), its lessons apply with equal force to criminal legislation. In a sense, the *Ex Post Facto* clause is the constitutional equivalent *vis a vis* criminal cases to the statutory interpretation rule articulated in *Landgraf.*

■ Applying the above analysis to the case at hand, the threshold question for the Court is whether Congress expressly prescribed the reach of the statute.[4] As defendant observes and the government concedes, Congress gave no express indication of retrospective intent in enacting the federal death penalty statute. Although the statute clearly indicates that its provisions shall apply to all offenses for which a penalty of death is provided, *see* 18 U.S.C. §§ 3591–3598, it contains no indication whatsoever that it was meant to apply to those death-eligible crimes committed *prior to* its 1994 enactment. *See* Tr. February 12, 2003, at 15–17, 44.

■ The absence of an express retroactive intent does not, however, end the inquiry. When assessing whether an implied intent to legislate retroactively exists, the Court must presume that Congress intended the act to be constitutional. In accordance with this analysis, the next question for the Court is whether applying the FDPA to the defendant in the absence of a clear legislative intent would be impermissibly retrospective. One relevant inquiry for the Court in its efforts to analyze this issue is whether the statute in question fits into any of the categories in which the *Landgraf* opinion suggests retroactive application would be permissible. It is abundantly clear that the FDPA concerns neither prospective relief nor jurisdiction. The Court finds it equally clear that the FDPA is not merely procedural in its provisions.

The FDPA indisputably adds "new legal consequences" to acts committed before its enactment. *See Danforth v. Groton Water Co.,* 178 Mass. at 476, 59 N.E. 1033. As noted above, the statute not only created new sentencing procedures, but established new crimes and defined new statutory aggravating and mitigating factors. Defendant is thus correct in his assertion that the FDPA cannot fairly be termed a uniquely procedural statute. Even some of the allegedly "procedural" aspects of the FDPA, namely the establishment of statutory intent and aggravating factors as prerequisites for the imposition of the death penalty, "are in their actual operation essential elements of new death-eligible crimes." Def.'s Reply at 15.

■ The Supreme Court's recent decision in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), provides ample guidance that the changes embodied in the FDPA cannot be viewed as merely procedural. In *Ring,* the Supreme

---

**4.** As the defense notes, "it is easy to lose sight of the need for this threshold determination of Congressional intent ..." Most of the Supreme Court's *Ex Post Facto* jurisprudence developed in cases from state courts, where legislative intent was no longer at issue. *See, e.g. Rogers v. Tennessee,* 532 U.S. 451, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001), *Collins v. Youngblood,* 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344(1977), and *Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937). In each of these cases, the only question before the Supreme Court was whether the state's expressed intent to apply a new law retroactively violated the U.S. Constitution. Def.'s Reply at 14.

Court held that the rule enunciated in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), applies with equal validity to capital cases. Thus, where a sentence of death is authorized only upon a finding of certain facts, those facts "operate as 'the functional equivalent of an element of a greater offense.'" *Ring,* 122 S.Ct. at 2443 (quoting *Apprendi,* 530 U.S. at 494 n. 19, 120 S.Ct. 2348). Consequently, those facts must be presented to the grand jury and included in the indictment, *see e.g., Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), and ultimately "found by a jury." *Ring,* 122 S.Ct. at 2443. Because the FDPA creates a new substantive offense of "aggravated murder," the crime itself did not exist at the time of the alleged conduct presently at issue. Def.'s Mot. at 23. While Congress enacted the FDPA without the benefit of the *Ring* decision's guidance, it undoubtedly recognized that the life or death consequences flowing from the FDPA's new statutory aggravating factors could not permissibly apply to crimes already committed. Def.'s Reply at 15. Because the changes incorporated in the FDPA cannot, in their entirety, be described as "procedural," the Act clearly cannot apply retroactively in the absence of clear legislative intent.

■ The canon of constitutional avoidance holds that when "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *Harris v. United States,* 536 U.S. 545, 122 S.Ct. 2406, 2413, 153 L.Ed.2d 524 (2002) (citing *United States ex rel Attorney General v. Delaware & Hudson Company,* 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909)). As demonstrated in the prior discussion, the Court does not find the FDPA to be ambiguous *vis a vis* retro-

activity. Were the statute's scope to be interpreted as such, however, constitutional avoidance would militate heavily against applying it on a retroactive basis. As both the government and the defense acknowledge, interpreting the FDPA, as written, to apply retrospectively would violate the *Ex Post Facto* clause of the Constitution. Tr. February 12, 2003, at 22: 20–22; 61: 15–25; 62: 1–10; 72: 14–23.

The *Ex Post Facto* clause provides that no "*ex post facto* Law shall be passed" "by Congress." U.S. CONST. art. I, § 9, cl. 3. Justice Chase's opinion in the case of *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798), discussed the four categories of laws that represented the Framers' "core concern(s)" in adopting the *Ex Post Facto* provision. *Collins,* 497 U.S. at 41, 110 S.Ct. 2715.

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punished such action.2d. Every law that aggravates a crime, or makes it greater than it was, when committed.3d. Every law that changed the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.

*Calder,* 3 Dall. at 390.

*Calder's* four categories were soon embraced by contemporary scholars. *Carmell v. Texas,* 529 U.S. 513, 524, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000). In writing on the *Ex Post Facto* clause, Justice Story, for instance, stated that

> [T]he general interpretation has been, and is, . . . that the prohibition reaches every law, whereby an act is declared a crime, and made punishable as such,

when it was not a crime, when done; or whereby the act, if a crime, is aggravated in enormity, or punishment; or whereby different, or less evidence, is required to convict an offender, than was required, when the act was committed.

3 Commentaries on the Constitution of the United States § 1339, p. 212 (1833).

The Supreme Court has repeatedly endorsed both this understanding in general and the fourth *Calder* category in particular. *Id.* at 525, 120 S.Ct. 1620. *See, e.g., Lynce v. Mathis,* 519 U.S. 433, 441, n. 13, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997); *Dobbert,* 432 U.S. at 292, 97 S.Ct. 2290; *Malloy v. South Carolina,* 237 U.S. 180, 183–184, 35 S.Ct. 507, 59 L.Ed. 905 (1915); *Mallett v. North Carolina,* 181 U.S. 589, 593–594, 21 S.Ct. 730, 45 L.Ed. 1015 (1901).

Among the purposes advanced by the constitutional prohibition of these categories was the interest in ensuring that individuals "may feel secure in acting in reliance on existing law" and that "fair notice will be given of any charge." *Warren v. United States Parole Comm'n,* 659 F.2d 183, 188 (1981), *cert. denied,* 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982). The *Warren* Court also noted that

the elements of fair notice and reasonable reliance are closely associated with another basis for the *ex post facto* proscription. Because an *ex post facto* law fails to provide fair warning, it cannot serve the core purpose of the criminal law, to regulate behavior by threatening unpleasant consequences should an individual commit a harmful act. Obviously,

when a law is enacted after the fact, the time for threats has already passed. *Id.*

■ It is clear that, pursuant to the *Ex Post Facto* clause of the Constitution, the provisions of the FDPA creating new substantive crimes cannot be applied on a retrospective basis. While a statute as a whole must be more "onerous" than the prior law in order to violate the *Ex Post Facto* clause, it is hard to dispute that, under the FDPA, the defendant would be eligible for the death penalty under certain conditions which would not render him death-eligible under Title 49. Specifically, applying the FDPA procedures to air piracy crimes committed prior to 1994 would clearly add death as a possible punishment in circumstances involving aggravating factors beyond the six listed in § 1473, as well as in cases in which a § 1473 mitigating factor is found. In essence, the FDPA extends death eligibility beyond those circumstances envisioned in § 1473 by adding new statutory aggravating factors and by downgrading five absolute statutory defenses to the death penalty into mere mitigating factors. Def.'s Mot. at 30. Under the FDPA, therefore, and in violation of the third *Calder* prohibition, the *possible* punishment for the crime defendant allegedly committed is greater, *in certain circumstances,* than under Title 49. By adding aggravating factors, and downgrading what were construed as statutory bars to mere mitigating factors, in the language of *Collins,* the FDPA "deprives one charged with crime of ... defense[s] available according to law at the time when the act was committed." *Collins,* 497 U.S. at 42, 110 S.Ct. 2715.

Even if the maximum penalty under the FDPA and Title 49 is found to be identical,[5] the mere possibility that the defen-

---

**5.** Whether the maximum penalty of death was available in 1986 pursuant to § 1473 of Title 49 is itself an issue in the present case. Be-

cause the Court is herein considering the applicability of the FDPA to defendant, it will not reach the question of the notice of death

dant could receive death under the FDPA while receiving a lesser sentence under Title 49 raises grave concerns. The defendant is not required to show that he *would have* received a lesser sentence under Title 49, but rather that he *could have*. *See Lindsey v. Washington,* 301 U.S. at 401–402, 57 S.Ct. 797 (holding that retrospective application of the relevant statute constituted a violation of the *Ex Post Facto* clause and stating that "[i]t is plainly to the substantial disadvantage of petitioners to be deprived of all opportunity to receive a sentence which would give them freedom from custody and control prior to the expiration of the 15–year term.") The fact that Mr. Safarini could face the death penalty under certain "new" conditions is undoubtedly a "substantial" disadvantage of the FDPA. In addition, substituting the FDPA procedures for § 1473 would violate the fourth *Calder* prohibition in two ways. First, allowing the consideration of additional aggravating factors would "alter[ ] the legal rules of evidence" and "receive[ ] different" testimony on the question of death eligibility than under the law governing at the time of the offense. *Calder,* 3 Dall. at 390. Second, requiring the jury to weigh aggravating and mitigating factors to reach a recommendation as to death would alter the "amount or measure" of proof necessary to impose the death penalty. Def.'s Mot. at 31 (citing *Carmell,* 529 U.S. at 550, 120 S.Ct. 1620). As defendant persuasively argues, the same measure of proof that would previously have guaranteed a life sentence could now result in one of death. Def.'s Mot. at 31.

Because it is manifest, pursuant to the *Landgraf* rule and the cannon of constitutional avoidance, that those portions of the 1994 federal death penalty statute creating *new* crimes cannot be applied on a retroac-

tive basis, it seems clear that if Congress intended courts to interpret those portions relating to previously death-eligible crimes retroactively, it would have said so explicitly. There is no basis whatsoever for this Court to presume, in the absence of clear congressional intent and at the risk of violating the Constitution, that certain parts of the act should be prospective only while certain others should apply on a retroactive basis.

While the government makes much of the *Landgraf* Court's reference to *Dobbert,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344, which involved an intervening state statute altering the roles of judge and jury, the Court finds that *Dobbert* can be readily distinguished. In holding that "[e]ven though it may work to the disadvantage of a defendant, a procedural change is not ex post facto," *Dobbert,* 432 U.S. at 293, 97 S.Ct. 2290, the *Dobbert* Court shed considerable light on the meaning of "procedural." In particular,. it stated that the "clearly procedural" statutory change at issue in *Dobbert* "simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime." *Id.* at 293–94, 97 S.Ct. 2290. In the language of *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884), application of the *Dobbert* statute did not implicate the *Ex Post Facto* clause:

> The crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute.

*Hopt,* 110 U.S. at 589–590, 4 S.Ct. 202.

The changes wrought by the FDPA in the federal death penalty legal landscape

provided by the air piracy statute's sentencing

provisions.

are clearly more substantive than those brought about by the statute in *Dobbert.* As discussed above, the 1994 death penalty statute did not simply alter the *methods* employed to determine whether a death sentence was applicable. To the contrary, the FDPA altered the very conditions under which such a sentence was available. Both the applicable punishment and the quantum of proof necessary to impose it were affected by the changes ushered in by the FDPA. Moreover, because the Florida statute in *Dobbert* was a state statute, there was no doubt or ambiguity as to legislative intent.

It appears to the Court that the key to resolving the present motion lies in the government's own concession. The government is asking the Court to apply to defendant the ameliorative sentencing procedures of the FDPA in conjunction with the protective provisions of the now defunct Anti–Hijacking Act. The government's position is that the Court has the authority and, indeed, the obligation to amend the FDPA's procedures pursuant to its duty to uphold the law. Specifically, the government contends that the Court *must* resurrect the provisions of Title 49 in order to apply the FDPA and yet avoid violating the *Ex Post Facto* clause of the Constitution. In the course of oral argument, in fact, government counsel stated the following:

> The two provisions that favored defendant Safarini and to which he's constitutionally entitled was the fact that … although there's some overlap between the two sets of aggravating factors, under Title 49, there were five specific factors. The government had to prove one of them. Now, under the new federal death penalty act, there's 16 factors. So it would violate *ex post facto* if the government proved one of the new, one of the new statutory statutory aggravators that wasn't in the old and still [im-

]pose the death penalty. That couldn't have been done.

Tr. February 12, 2003, at 72: 14–23.

As far as the Court is concerned, the government's argument amounts to a concession that, *as written,* the FDPA in this case would be impermissibly retroactive. Without the benefit of affirmative steps by the Court, therefore, the defendant would be subjected to "new legal consequences" if sentenced under the 1994 federal death penalty statute. In essence, the government is asking the Court to analyze the FDPA *as amended* by the removal of certain provisions and the additions of certain others. Its argument is that *the amended statute,* itself a judicially-created amalgam of one valid and one repealed statute, would be constitutionally permissible. While it may well be that such a statute, if enacted by the legislature, would pass muster under the *Ex Post Facto* clause, a discussion of that legal possibility at the present time serves only to confuse the issue. This court is not being asked to determine the viability of the government's proposed statute. Rather, it is being asked in the first instance to find that the FDPA applies to defendant and, in the second, to modify the FDPA in such a way as to render its application constitutional. For the reasons outlined herein, the Court cannot comply with the government's first request. It would be inconsistent with the basic rule of statutory construction set forth in *Landgraf* to find that the substantive provisions of the FDPA apply to defendants charged with crimes committed prior to its enactment.

## Conclusion

■ In light of the strong presumption against the retroactive application of statutes, and in the absence of clear Congressional intent to the contrary, the Court cannot find that the Federal Death Penal-

ty Act of 1994 applies to homicides, such as that charged in the present case, committed prior to its enactment. While the retrospective application of legislative acts in the absence of Congressional intent may, in certain circumstances, be permissible, the Court is not persuaded that any of those circumstances are present in the instant case. In view of the FDPA's creation of new substantive crimes, addition of aggravating factors and modifications with respect to mitigating conditions, it would be a fiction to describe the statute as merely "procedural." As conceded by the government, application of the FDPA to defendant in the present case would constitute a clear violation of the *Ex Post Facto* clause in the absence of certain judicially-made changes to the statute. While the government has focused on the propriety of a proposed statute incorporating provisions of both the FDPA and the Anti–Hijacking Act, that is not the proper focus for the threshold retroactivity query.

Because the Court finds that the FDPA cannot be applied to defendant without violating retroactivity principles and the *Ex Post Facto* clause of the Constitution, it need not address the remaining issues.

For the foregoing reasons, it is by the Court hereby

**ORDERED** that defendant's Motion for Order Barring the Government from Seeking the Death Penalty is **GRANTED**; and it is

**FURTHER ORDERED** that a status conference is scheduled in this case for April 11, 2003 at 10:00 a.m. in Courtroom One.